UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 09-60002-CIV-GOLD-GOODMAN

EQUITY INVESTMENT PARTNERS, LP,

       Plaintiff,

v.

UNITED STATES OF AMERICA,

       Defendant.

_____/

UNITED STATES OF AMERICA,

       Counterclaim Plaintiff,

v.

EQUITY INVESTMENT PARTNERS, LP,
EQUITY INVESTMENT PARTNERS, LLC,
RANDOLPH LENZ,

       Counterclaim Defendants.

_____/

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING NON-JURY TRIAL</u>**

       THIS CAUSE is before the Court in the above-captioned matter, which came on for a one-day, non-jury trial on February 7, 2011.  *See* **[ECF No. 93]**.  Three witnesses were sworn and testified.  I have carefully considered the testimony of the witnesses, Randolph Lenz and Stacie Daley for Plaintiff Equity Investment Partners, LP; and Calvin Byrd of the Internal Revenue Service for Defendant and Counterclaim Plaintiff United States.  In addition, I have also considered the exhibits admitted in evidence, the parties' written submissions, and applicable law.  The following findings of fact and conclusions of law are made pursuant to the requirements of Rule 52 of the Federal Rules of Civil Procedure.

# I.   **FINDINGS OF FACT**[1]

**A.   Procedural history**

    **i.   Instant case**

1.    On January 2, 2009, Plaintiff Equity Investment Partners, LP ("EIP") filed its Complaint against Defendant United States of America, Internal Revenue Service ("IRS").  **[ECF No. 1]**.

2.    EIP asserted one count for declaratory judgment seeking a declaration that its mortgage on certain property at 3900 Galt Ocean Drive in Fort Lauderdale, Florida ("Property") is superior to the IRS tax lien on the Property.  *Id.* ¶ 16.

3.    On January 30, 2009, EIP filed its Amended Complaint asserting causes of action for declaratory judgment and to quiet title/foreclosure.  **[ECF No. 5]**.

4.    The IRS filed its Counterclaim against EIP asserting that it is entitled to foreclose on the Property free and clear of any other liens, that Randolph Lenz's ("R. Lenz") transfer of the Property to EIP in lieu of foreclosure extinguished EIP's interest in the Property, and that the mortgage and mortgage modification were fraudulent conveyances.  **[ECF No. 10 ¶¶ 26-56]**.

5.    On February 24, 2009, the parties filed a Joint Agreed Stipulation Regarding Sale of Property, agreeing to sell the Property in order to liquidate the asset and deposit net sale proceeds from the transaction into an escrow account.  **[ECF No. 18 ¶¶ 4, 6]**.

---

[1] To the extent factual findings appear under the "Conclusions of Law" heading or *vice versa*, the pertinent facts or conclusions shall be construed appropriately and shall not be constrained by the heading under which they appear.

6.     The IRS agreed to release the Property from its tax lien to permit the sale of the Property free and clear of the tax lien on the condition that, upon release of the Property from the IRS' tax lien, the lien would attach to the funds in the escrow account as it had attached to the Property.  **[ECF No. 18 ¶ 7]**.

7.     The parties agreed that the escrowed proceeds would be distributed to the parties consistent with my determination as to lien priority.  *Id.* ¶ 10.

8.     On February 27, 2009, I issued an Order Approving Joint Agreed Stipulation, ordering that the funds remain in escrow and not be distributed, disbursed, or paid until I determine which party has priority over the proceeds.  **[ECF No. 19]**.

9.     On August 18, 2009, I issued an order Granting in Part Defendant's Motion for Summary Judgment and Denying Plaintiff's Motion for Summary Judgment.  **[ECF No. 52]**.

10.     On August 18, 2009, final judgment was entered in favor of the IRS as to the superiority of its lien to EIP's mortgage.  **[ECF No. 53]**.

11.     On September 15, 2009, an Amended Final Judgment was entered requiring EIP's counsel to distribute funds from the proceeds of the sale of the property at issue to the United States.  **[ECF No. 58]**.

12.     On September 18, 2009, Plaintiff filed a Notice of Appeal.  **[ECF No. 59]**.

13.     On April 29, 2010, the Eleventh Circuit Court of Appeals issued an opinion reversing and remanding the case for further consideration in light of its recent opinion, *Equity Investment Partners, LP v. Lenz*, 594 F.3d 1338 (11th Cir. 2010).  **[ECF No. 70]**; *see infra* § I.A.ii.

3

14.     The Eleventh Circuit noted that subsequent to briefing for the appeal in this case, it decided the *Lenz* case which was before the Honorable Cecilia M. Altonaga.  *Id.* at 4.

15.     On July 9, 2010, I issued an Order Regarding Proceedings on Remand.  **[ECF No. 71]**.

16.     Pursuant to this order, I explained that the Eleventh Circuit's mandate concluded that my determination regarding whether EIP's mortgage qualified as a security interest for purposes of 26 U.S.C. § 6323(a) was in error.  *Id.*

17.     I ordered the parties to file a submission regarding whether supplemental briefing on the extinguishment issue—which was not addressed in detail in my summary judgment order—was warranted.  *Id.*

### ii.     Case No. 08-CV-60630-CMA

18.     On April 29, 2008, EIP filed suit against Karin Lenz ("K. Lenz") and the IRS to foreclose its mortgage on another property located at 30 Compass Point in Fort Lauderdale, Florida.  *See Equity Investment Partners, LP v. Lenz et al.*, Case No. 08-CV-60630-CMA; **[ECF No. 1]**.[2]

19.     On February 10, 2009, Judge Altonaga granted the United States' Motion for Partial Summary Judgment and denied EIP's Motion for Summary Judgment.  **[ECF No. 67]**.

20.     On April 7, 2009, EIP filed a notice of appeal of the February 10, 2009 order, as well as Judge Altonaga's March 26, 2009 Order Denying Plaintiff's Motion for Reconsideration.  **[ECF No. 81]**.

---

[2] All electronic case filing citations in this section refer to Case No. 08-CV-60630-CMA.

21.     Judge Altonaga held that EIP did not hold a security interest as defined by 26 U.S.C. § 6323(h)(1), and the IRS was entitled to partial summary judgment establishing the priority of the tax lien.  *Id.*

22.     On January 29, 2010, the Eleventh Circuit issued a published opinion reversing in part, affirming in part, and remanding the case to Judge Altonaga.  *See Equity Inv. Partners, LP v. Lenz*, 594 F.3d 1338, 1345 (11th Cir. 2010).

23.     In the case before Judge Altonaga, EIP, as in the instant case, claimed it held a security interest in the real property superior to the IRS' tax lien.  *Id.* at 1342.

24.     The Eleventh Circuit determined that a disputed issue of a material fact precluded granting summary judgment to either party.  *Id.* at 1345.

25.     Specifically, the Eleventh Circuit noted that "[a]t dispute is whether the mortgage and mortgage modification were executed to secure repayment of the debts owed to Equity by Randolph and Karin."  *Id.*

26.     The Eleventh Circuit cited statements in affidavits and deposition testimony regarding the understanding and agreement of the Lenzes and their daughter, Stacie Daley ("Daley"), with respect to using the property to secure repayment of funds advanced on behalf of the Lenzes.  *Id.*

27.     While the Eleventh Circuit noted that these statements could have been "self-serving . . . [i]f believed, they would support a finding that the mortgages were given to satisfy the antecedent debts.  This finding would lead the court to hold that the mortgages were supported by past consideration and that Equity parted with 'money or money's worth.'"  *Lenz*, 594 F.3d at 1345.

5

28.     Judge Altonaga held a trial on June 21, 2010, and on July 28, 2010, determined that the IRS' tax liens were superior to EIP's mortgage and mortgage modification.  **[ECF No. 114]**.

29.     Judge Altonaga determined that EIP's mortgage and mortgage modification were not entitled to priority because they did not qualify as "security interests" as defined in 26 U.S.C. § 6323 and the mortgage and mortgage modification could be set aside under Florida law as fraudulent conveyances.  *Id.*

30.     Final judgment reflecting these findings was entered on July 30, 2010. **[ECF No. 116]**.

31.     EIP appealed that decision.  **[ECF No. 117]**.

32.     On April 1, 2011, the Eleventh Circuit issued an unpublished *per curiam* opinion affirming Judge Altonaga's order following remand following oral argument on this appeal.  *Equity Inv. Partners, LP v. Lenz*, 2011 U.S. App. LEXIS 6768 (11th Cir. 2011).

33.     In relevant part, the Eleventh Circuit noted that "[a]fter hearing witness testimony at trial, the district court made adverse credibility findings that resolved the factual issues in this case, and to which we defer."  *Id.* at *1.

**B.    Factual background**

    **i.    EIP**

34.    On January 20, 1995, Randolph W. Lenz ("R. Lenz"),[3] Equity Investment Partners LLC ("EIP LLC"), and two other individuals formed Plaintiff Equity Investment Partners, L.P. ("EIP" or "EIP LP") as an investment partnership.[4]

35.    EIP was an investment vehicle which participated in deals involving, *inter alia*, technology companies and manufacturing.  (Trial Transcript ("Tr.")[5] at 11:2-7, 56:2-5, 57:6-16).

36.    On February 29, 2000, the three individuals withdrew as partners of EIP LP, leaving EIP LLC and ALFT LLC as partners.  (Ex. 40).

––––––––––––––––––––

[3] Following college and the Marine Corps, R. Lenz worked for a company making pieces for the moon shot and nuclear submarines, as well as Intercontinental ballistic missiles ("ICBMs").  Tr. at 51:14-19.  Subsequently, R. Lenz went into the real estate and manufacturing businesses, acquiring manufacturing companies around the world. *Id.* at 51:20-24.  In 1981, R. Lenz put Terex Corporation on the New York Stock Exchange and was involved in two Fortune 500 companies.  *Id.* at 52:3-16.  He also founded and purchased several banks.  *Id.* at 52:19-22.  In 2001, R. Lenz's net worth was in excess of $100 million.  *Id.* at 52:25-53:1.  R. Lenz eventually became involved in the Connecticut Bank of Commerce as Chairman of the Board.  *Id.* at 52:17-24.  R. Lenz has a mine in Zimbabwe and a mine in South Africa.  *Id.* at 76:15. Though the mines were not profitable, R. Lenz invested $7.5 million of his money in the mines, which are a recognized asset and recognized value.  *Id.* at 76:18-20.

[4] Where no citation to the trial transcript appears in the instant Findings of Fact section, these are undisputed facts agreed upon by the parties as established in the Amended Pretrial Stipulation **[ECF No. 91]** and/or in the parties' proposed Findings of Fact submitted to the Court.

[5] Since neither party has requested an official transcript of the trial proceedings, "Tr." refers to the unofficial transcript of the trial.

37.     In 2000, R. Lenz brought in his adult children, Stacie Daley and Corbett Lenz (collectively referred to herein as "children"), as the principals of EIP LP.  *Id.* at 56:3-5.

38.     At that time, EIP had no value or *de minimis* capital.  *Id.* at 56:8-13, 57:22-25.

39.     Following R. Lenz's withdrawal as a member of EIP, he did not have any influence or say in the day-to-day operations of the company and the children made decisions on behalf of EIP.  *Id.* at 10:19-23, 10:24-11:1, 56:22-57:3.

40.     In effect, the children were loaning money to their parents vis-à-vis companies within which the children were members.  *Id.* at 30:2-7.

41.     R. Lenz testified that he took monies from EIP rather than his children's personal monies and bank accounts because EIP "had a source of liquidity that was probably in excess of what the other companies had as liquidity."  *Id.* at 58:16-22.

42.     According to R. Lenz, the choice of how to loan the money was made by the children, rather than suggested by R. Lenz.  *Id.* at 59:13-15.

43.     At present time, the children each own 49.5% of EIP and the Freida Trust, the third partner, owns 1% of EIP.

**ii.     Property**

44.     On September 21, 1999, Alass Investment Partners, Ltd. issued a Warranty Deed to R. Lenz for property located at 3900 Galt Ocean Drive, #1917, Fort Lauderdale, Florida ("Property").

45.     At the time R. Lenz obtained title to the condominium property, he was not aware of outstanding tax issues with the IRS.  *Id.* at 53:10-12.

46.     R. Lenz had been audited 27 consecutive years by the IRS, had been involved in litigation against the IRS, and first knew that the IRS was going to impose an assessment in 2004.  *Id.* at 53:12-13, 63:2-13.

47.     Neither the children nor the companies the children owned had lent R. Lenz any money at that time.  *Id.* at 53:18-23.

48.     The children began lending money to R. Lenz in 2002 when the Federal Deposit Insurance Corporation ("FDIC") indicated that the Connecticut Bank of Commerce needed more capital.  *Id.* at 53:24-54:4.

49.     In the summer of 2002, the FDIC took over the Connecticut Bank of Commerce and shortly thereafter, R. Lenz's assets and bank accounts were frozen.  *Id.* at 54:5-10, 82:24-25.

50.     Subsequently, R. Lenz borrowed from his children's companies, agreeing to repay the companies.  *Id.* at 54:16-20.

**iii.    Loan and Security Agreement**

51.     On January 1, 2002, EIP and R. Lenz entered into a Loan and Security Agreement prepared by Daley.  (Tr. at 11:8-17, 51:1-2, 54:21-25; Ex. 52).

52.     R. Lenz entered into the agreement because EIP was lending R. Lenz substantial amounts of money and Daley wanted to protect the company.  *Id.* at 11:18-23.

53.     EIP was lending money to the Lenzes because the Lenzes needed capital to the Government freezing R. Lenz's assets, restricting his access to cash, and locking up his liquidity.  *Id.* at 11:24-12:2, 50:16-18.

54.     Among the payments EIP made for the Lenzes were legal fees and living expenses, including credit card bills, power bills, and real estate taxes.  *Id.* at 14:22-15:2, 63:15-64:11.

55.     EIP also paid expenses incurred on the condominium such as association fees, real property taxes, and insurance.  *Id.* at 15:4-10, 63:15-64:11.

56.     Daley testified that at the time EIP entered into this agreement with R. Lenz, Daley was not aware of any of her parents' tax issues.  *Id.* at 12:2-5.

57.     The Loan and Security Agreement does not contain a loan amount or repayment terms, but states that R. Lenz has granted EIP a security interest in all of his assets as security for the loan.

58.     The IRS received information from counsel for R. Lenz and K. Lenz (collectively "the Lenzes" or "the parents") that EIP had forwarded funds to the Lenzes for their living expenses, including the mortgages and legal fees.  *Id.* at 89:2-6.

59.     However, Calvin Byrd, the IRS Revenue Officer assigned to the collection of the Lenzes' tax liabilities, could not confirm or deny that this was the scenario.  *Id.* at 89:7-8.

60.     Notably, the Officer Byrd admitted during trial testimony that there was nothing in his investigation which demonstrated otherwise.  *Id.* at 89:9-12.

61.     Also on January 1, 2002, when EIP first started lending money to the Lenzes according to Daley's testimony, EIP and R. Lenz executed a master promissory note under which R. Lenz promised to repay advances made by EIP on his behalf.  (Tr. at 13:19-14:4, 14:14-18, 60:18-23; Ex. 53.)

62.     The note states that the amount outstanding under it shall not exceed $5,000,000.  *Id.* at 60:24-61:1; Ex. 53.

63.     The promissory note references legal fees of approximately $1.6 million paid by EIP for the Lenzes.  *Id.* at 14:5-13.

64.     Because this arrangement was made by family members, R. Lenz and his children negotiated this agreement without independent counsel representing each of them.  *Id.* at 61:13-62:5.

65.     In June or July 2004, the IRS levied the assessment and prior to that time, at least $300,000 was paid on behalf of the Lenzes.  *Id.* at 20:25-21:16.

66.     Prior to the official notification of assessment (Ex. 58) and the modification of the mortgage in October 2004, there was no notification regarding an intent to levy. *Id.* at 95:11-24.

67.     On June 16, 2004, the Lenzes signed a "Closing Agreement as to Final Determination of Tax Liability and Specific Matters" with the IRS to "determine with finality" their tax liability for the years 1989, 1990, 1992, and 1993.  *Id.* at 75:19-76:6, 77:4-12; Ex. 57.

68.     On August 2, 2004, the IRS made assessments against the Lenzes for unpaid income taxes for the tax years 1989, 1990, 1992, and 1993.

69.     As of February 1, 2010, the outstanding liability for those assessments was $3,156,753.38.  **[ECF No. 91]**.

### iv.    October 2004 mortgage

70.    On October 19, 2004, EIP and R. Lenz entered into a mortgage and security agreement for $300,000 that covered property located at 3900 Galt Ocean Drive in Fort Lauderdale, Florida.  (Tr. at 8:5-13; 64:12-15); *see also* Ex. 55.[6]

71.    R. Lenz provided EIP with the mortgage because Daley, an attorney for nearly 14 years who prepared the mortgage, asked R. Lenz for security for the monies that EIP had loaned to the Lenzes.  *Id.* at 8:14-19, 9:6-7, 51:7-8.

72.    By October 2004, EIP loaned in excess of $2 million to the Lenzes.  *Id.* at 8:2-4.

73.    In 2003, EIP loaned R. Lenz $1.5 million.  *Id.* at 41:11-16; Ex. 24.

74.    In the first four months of 2004, EIP loaned R. Lenz over $500,000 more.  *Id.* at 41:19-22; Ex. 23.

75.    By the time Daley prepared the mortgage, several million dollars of EIP's loan to the Lenzes remained outstanding.  *Id.* at 9:13-16; *see also* 65:15-19, 75:13-18.

76.    However, the mortgage was for an amount of $300,000—and not a greater sum that was owed—because the value of the condominium that the mortgage

---

[6] In addition to the mortgage on the condominium, Daley also obtained a mortgage on the home owned by K. Lenz at the time.  EIP ultimately had to sue K. Lenz to foreclose on the mortgage in order to try to sell the home to get paid back.  Tr. at 26:21-27:9.  This litigation was before Judge Altonaga in Case No. 08-CV-60630-CMA.  *See supra* § I.A.ii.

Daley testified that EIP did not sue R. Lenz to foreclose on the mortgage on the condominium because EIP "[g]ot a deed in lieu, essentially.  [So] they wouldn't have to go through the litigation and the expense."  Tr. at 28:9-12.  Daley testified that she did not seek a deed in lieu with K. Lenz because she "[d]idn't think about it" and "[b]ecause it was after [Daley] went through everything with [K. Lenz]," incurring expenses and litigation.  *Id.* at 28:14-20.

secured was $300,000 and Daley could not put a mortgage on a piece of property in excess of the value of the property. *Id.* at 9:20-24; *see also id.* at 34:20-22, 65:20-66:2.

77.    The consideration that EIP provided to R. Lenz in exchange for the $300,000 mortgage was at least $300,000 in cash to pay bills. *Id.* at 66:3-5.

78.    By October 2004, EIP already had a security interest in the condominium based on the original loan and security agreement, but the mortgage was recorded so that EIP could perfect the security interest. *Id.* at 23:9-15.

79.    Upon direct examination, Daley testified that EIP did not perfect the security interest earlier than October 2004 due to the costs of recording documents in Florida and because Daley wanted to ensure that the proper documentation and perfection of security interests were aligned prior to R. Lenz's prison sentence.[7] *Id.* at 23:16-22, 24:14-25:6, 42:6-11; *see also* 64:16-22.

80.    Further, in October 2004, the terms of the FDIC settlement were still being finalized, and the settlement was entered into on November 16, 2004 as a result of years of negotiations. *Id.* at 23:23-25, 66:9-17.

81.    In November 2004, as part of a settlement entered into with the FDIC which was negotiated over the course of several years, Corsta Corporation, an entity that had been gifted to the children for over 20 years, transferred $8.5 million to the

---

[7] In October 2004, Daley was aware of the litigation with the FDIC, as she was a party to that litigation. *Id.* at 48:2-11.  Daley was also aware that R. Lenz had pled guilty to misapplication of bank monies, would be sentenced soon, and had been unemployed for a long time. *Id.* at 48:7-18.

R. Lenz entered into his plea deal in 2004. *Id.* at 66:6-8.  R. Lenz was eventually incarcerated for 33 months from February 2005 until late 2007. *Id.* at 69:19-22.  While R. Lenz was incarcerated, EIP continued to loan funds to cover K. Lenz's expenses and expenses incurred for the condominium. *Id.* at 69:23-70:5.

FDIC as part of a settlement which resulted in a settlement of all claims against R. Lenz, K. Lenz, C. Lenz, S. Daley, and various other entities.  *Id.* at 66:12-17, 68:7-13, 82:19-20; Ex. 26.

82.    The settlement agreement with FDIC was one of the reasons R. Lenz provided the mortgage in October 2004 because he was facing imprisonment and was wrapping matters up.  *Id.* at 70:6-17, 81:1-4.

83.    However, the settlement agreement with the IRS had nothing to do with providing the mortgage in October 2004 because the settlement agreement was a personal tax issue between R. Lenz (and K. Lenz, by virtue of the Lenzes' joint filings) and the IRS.  *Id.* at 70:18-71:2.

84.    The children were unaware of R. Lenz's personal tax issues, and K. Lenz similarly did not have any knowledge of the issues.  *Id.* at 71:3-8.

85.    Daley testified that in October 2004, she was not aware of any tax issues her parents had or that any tax liens were recorded against the Property.  *Id.* at 24:1-7.

86.    Furthermore, IRS Officer Byrd testified that "[he] was not able to determine that [the children] were aware of the [Lenzes'] examinations with the IRS and that there was a tax liability."  *Id.* at 89:17-18.

87.    There was nothing in Officer Byrd's file that he has been able to rely on to show the children's knowledge of their parents' tax situation.  *Id.* at 89:20-22.

88.    The mortgage did not have a payment schedule, *i.e.*, calling for monthly payments.  *Id.* at 35:18-23.

89.    There was no time period for repayment or interest rate.  *Id.* at 35:24-36:3.

90.     The mortgage referenced a commercial promissory note of "even date herewith," but none was attached, and Daley cannot recall if a commercial promissory note exists for the mortgage.  *Id.* at 36:4-37:2.

91.     R. Lenz intended to repay the $300,000 by selling the property after his mother passed away, which was the reason there were no specific details regarding the manner and date of repayment.  *Id.* at 66:23-67:8.

92.     Daley anticipated being repaid as a result of the mortgage transaction because "[she] knew that eventually [R. Lenz] would repay [her]."  *Id.* at 38:3-8.

93.     Daley testified that "[m]y father had told me he was going to pay me back so he's going to pay me back."  *Id.* at 38:10-12.

94.     Daley admitted that the contemplated plan to sell the condominium after her grandmother had passed was "[n]ot good business sense," and as a lawyer she would never advise a client as such.  *Id.* at 38:13-17.

95.     However, because R. Lenz was Daley's father, she took these actions by loaning the money and entering into the mortgage agreement without a payment schedule.  *See id.* at 38:17-19.

96.     There was no appraisal for the condominium, which was purchased by R. Lenz for Daley's grandmother, who lived there until her death in July 2008.  *Id.* at 12:9-16; 53:17.

97.     When the mortgage was entered into in October 2004, Daley's grandmother was still alive and living there.  *Id.* at 37:20-23.

98.     The reason the condominium was not sold immediately so that EIP could be repaid was because Daley's grandmother was still living there.  *Id.* at 37:24-38:2.

99. Though the condominium was purchased for approximately $265,000 in cash, there was some subsequent refurbishing worth $30,000 to $35,000. *Id.* at 12:16-22, 65:10-14.[8]

100. R. Lenz admitted that disclosing the IRS document acknowledging significant tax liabilities at the time of entering into the mortgage agreement for the condominium "would have been probably the right thing for me to have done, but I didn't because it was a personal issue." *Id.* at 77:13-19.

**v.    Wire transfers**

101. In January 2005, R. Lenz subsequently amended the loan and security agreement with EIP because in February 2005, R. Lenz was going to be incarcerated. *Id.* at 71:9-18.

102. On August 16, 2005, the IRS recorded a tax lien against the Lenzes for unpaid income taxes for the years 1989, 1990, 1992, and 1993 in the public records of Broward County, Florida.

103. As of the date the notice was prepared, August 8, 2005, the unpaid balance of those liabilities was $2,406,549.86.

104. Between May 30, 2002 and December 22, 2003, EIP made twelve wire transfers to R. Lenz's account totaling $1,188,500.

105. Between January 15, 2003 and February 25, 2003, Equity Merchant Banking Corporation made four wire transfers to R. Lenz's account totaling $281,000.

---

[8] Pursuant to an agreement with the Government, the condominium was sold with net proceeds between $400,000 and $500,000. Upon entry of the amended final judgment in this case on September 15, 2009, those funds were released to the Government. **[ECF No. 58]**; *see also* Tr. at 13:5-16.

106.   Between July 9, 2003 and September 16, 2003, First Out Corporation made three wire transfers to R. Lenz's account totaling $36,000.

107.   Between January 5, 2004 and April 29, 2004, EIP made ten wire transfers to R. Lenz's account totaling $31,000.

108.   On January 13, 2004, EIP transferred $43,261.28 to the law firm of Winston & Strawn.

109.   Additionally, between January 13, 2004 and January 10, 2005, EIP wrote three checks to Winston & Strawn totaling $884,416.15.

110.   Between January 6, 2004 and December 23, 2004, EIP made 52 wire transfers to Equity Merchant Banking Corporation totaling $1,216,000.

**vi.   October 2008 warranty deed in lieu of foreclosure**

111.   On October 9, 2008, R. Lenz issued a "warranty deed in lieu of foreclosure" for the subject property to EIP LLC.

112.   Daley testified that the grantee was EIP LLC, an entity owned by the children, because EIP LLC was the general partner of EIP LP, who had all the loan and security agreements with R. Lenz and was the entity that had been loaning the money. *Id.* at 29:21-25, 30:11-15, 45:8-10.

113.   The decision for who would be the grantee in order for the children to get repaid was likely made by the children themselves.  *Id.* at 30:8-10.

114.   The children sought a distribution in order to get their money back because they also owned EIP LLP.  *Id.* at 30:16-19.

115.    On October 9, 2008, R. Lenz also executed and delivered an Assignment of Parking Space to Equity Investment Partners, LLC for parking space number 386 at the Property.

116.    The Assignment of Parking Space was recorded with the Warranty Deed on October 10, 2008 in OR Book 45743 of the Public Records of Broward County, Florida.  (Ex. 61).

117.    Pursuant to an agreement between the parties that was approved by the Court, the subject property was sold and the parties agreed that their interests in the property attached to the proceeds of that sale just as they had attached to the property itself.  *See* Tr. at 30:22-31:1.

118.    Daley testified that EIP had to file the lawsuit because before the IRS consented to the sale of the property, the IRS originally objected to the sale.  *Id.* at 31:2-6.

119.    When EIP LLC obtained the deed, no satisfaction of mortgage was prepared or recorded, nor was a release prepared because R. Lenz still owed EIP the money.  *Id.* at 31:7-16, 73:24-74:1.

120.    No paperwork was provided by EIP to R. Lenz releasing R. Lenz because EIP had not been paid by R. Lenz.  *Id.* at 31:22-32:4.

121.    Because EIP has not received any proceeds from the sale of the condo, no release has been executed.  *Id.* at 32:12-15.

122.    The purpose of providing the deed in lieu of foreclosure was to avoid having to sue R. Lenz and facilitating the sale of the condominium.  *Id.* at 32:12-16; *see also id.* at 67:20-68:5.

123.   Daley testified that she "saw the excessive amounts of cash that went to attorneys and whatnot and the mental anguish that comes from litigation and everything else, hence I got a deed on my grandmother's condo to avoid what I had already been going through with my mother."  *Id.* at 40:17-21.

124.   Daley explained that the mortgage was used to secure EIP's position so that EIP did not have to enter into a mortgage on each occasion that EIP loaned money to R. Lenz or K. Lenz.  *Id.* at 44:3-11.

125.   EIP did not sue to foreclose on the mortgage of the condominium or the home for several years.  *Id.* at 44:12-14.

126.   EIP first sued K. Lenz to foreclose the mortgage on the home in approximately April 2008.  *Id.* at 44:15-19.

127.   Between the time K. Lenz signed the mortgage modification in August 2005 and when EIP sued to foreclose in April 2008, a significant amount of interest had accrued on the mortgage.  *Id.* at 44:20-23.

128.   When EIP sued to foreclose, the interest sought was the highest rate allowable by law, 24.99 percent.  *Id.* at 44:24-45:1.

129.   EIP did not institute a foreclosure action against R. Lenz because R. Lenz asked EIP not to in order to save the expense of retaining another attorney.  *Id.* at 72:18-23.

130.   EIP filed a foreclosure action against K. Lenz for the property at Compass Point because there was an underlying mortgage.  *Id.* at 72:24-73:1.

131.   When R. Lenz was released from prison, he did not have the ability to repay the loans provided by his children.  *Id.* at 71:24-72:1.

132.    R. Lenz has still not been able to repay the loans.  *Id.* at 50:19-20.

133.    The $300,000 mortgage remains outstanding and none of it has been repaid to EIP.  *Id.* at 32:19-23.

134.    R. Lenz still owes EIP over $300,000.  *Id.* at 32:24-25, 74:7-9.

## II.    CONCLUSIONS OF LAW

### A.    Jurisdiction

1.      I exercise subject matter jurisdiction over Plaintiff's complaint pursuant to 28 U.S.C. § 2410 because the United States of America is a party.

2.      I exercise subject matter jurisdiction over the United States' crossclaim and counterclaim pursuant to 28 U.S.C. §§ 1340, 1345 and 26 U.S.C. §§ 7402, 7403.

### B.    Priority of tax liens under federal law

3.      Federal law governs the relative priority of a federal tax lien in relation to competing liens.  *In re Haas*, 31 F.3d 1081, 1085 (11th Cir. 1994) (citing *Aquilino v. United States*, 363 U.S. 509, 513-15 (1960)), *overruled in part on other grounds in Green Tree Servicing, LLC v. United States*, 2011 U.S. Dist. LEXIS 35997 (D.N.H. Apr. 1, 2011).

4.      A federal tax lien is created by operation of law pursuant to 26 U.S.C. § 6321.  *In re Garcia*, 2002 WL 31409580 *4 (S.D. Fla. Sept. 6, 2002).

5.      26 U.S.C. § 6321 provides that "[i]f any person liable to pay any tax neglects or refuses to pay the same after demand, the amount . . . shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."

6.      Pursuant to 26 U.S.C. § 6322, the lien is imposed at the date of assessment:

> Unless another date is specifically fixed by law, the lien imposed by section 6321 shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed (or judgment against the taxpayer arising out of such liability) is satisfied or becomes unenforceable by reason of lapse of time.

26 U.S.C. § 6322.

7.      Specifically, 26 U.S.C. § 6323 outlines four circumstances under which a federal tax lien is inferior to a later-created lien.

8.      A federal tax lien is unenforceable where:  "[t]he lien imposed by section 6321 shall be not be valid as against any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary."  26 U.S.C. § 6323(a) (emphasis added); *see also In re Garcia*, 2002 WL 31409580, *4 (S.D. Fla. Sept. 6, 2002) (citing 26 U.S.C. § 6323(a)).

9.      26 U.S.C. § 6323 governs the relative priority of EIP's interest in the Property vis-à-vis the IRS' tax lien.

10.      Pursuant to 26 U.S.C. § 6323(a), EIP's mortgage must qualify as a security interest since EIP, as a mortgage holder, is not a purchaser, mechanic's lienor, or judgment lien creditor.

**C.      Security interest**

11.      The Internal Revenue Code defines a "security interest" as "any interest in property acquired by contract for the purpose of securing payment or performance of an obligation or indemnifying against loss or liability."  26 U.S.C. § 6323(h)(1).

12.     A security interest exists for priority purposes "(A) if, at such time the property is in existence and the interest has become protected under local law against a subsequent judgment lien arising out of an unsecured obligation, and (B) to the extent that, at such time, the holder has parted with <u>money or money's worth</u>."  26 U.S.C. § 6323(h) (emphasis added); *see also Equity Inv. Partners, LP v. Lenz*, 594 F.3d 1338, 1343 (11th Cir. 2010) (citing *In re Haas*, 31 F.3d at 1085).

13.     A security qualifies as a "security interest" if it meets the following criteria under a four-part test:  (1) the security interest was acquired by contract for purposes of securing payment, performance of an obligation, or indemnifying against loss; (2) the property to which the security interest was to attach existed at the time the tax lien was filed; (3) the security interest was, at the time of the tax lien filing, protected under state law against a judgment lien arising out of an unsecured obligation; and (4) the holder of the security interest parted with money or money's worth.  *In re Haas*, 31 F.3d at 1085 (citing 26 U.S.C. § 6323(h)(1); *Atlantic States Constr., Inc. v. Hand, Arendall, Bedsole, Greaves & Johnston,* 892 F.2d 1530, 1535 (11th Cir. 1990)).

14.     A mortgage must meet each of the preceding four conditions in order to be a valid security interest and therefore compete with a federal tax lien.  *See In re Garcia*, 2002 WL 31409580, *7 (S.D. Fla. Sept. 6, 2002); *Florida Land Title Co. v. Martinez*, 1995 WL 644217, *8 (M.D. Fla. Aug. 25, 1995).

15.     A security interest is legally enforceable and attaches if "(1) the secured party possesses the collateral or the debtor has signed a security agreement containing a description of the collateral; and (2) value has been given by the secured party; and

16.     Applying this federal law to the present case, it is undisputed that the Mortgage was filed in Broward County before the IRS filed its Notice.

17.     The mortgage was ahead of the IRS tax lien because it was recorded eight months prior to the lien.  Tr. at 96:17-22.

18.     However, because the tax lien is imposed as of the date of assessment, which occurred before the Mortgage was recorded, the tax lien takes priority unless EIP can demonstrate that it is a holder of a security interest pursuant to 26 U.S.C. § 6323(a).

19.     Accordingly, EIP must establish all conditions of Section 6323(h)(1) regarding security interests in order to be protected by Section 6323(a).  *See In re Haas*, 31 F.3d 1081, 1085 (11th Cir. 1994) ("To come within the protection of § 6323(a), a holder of a security interest must establish four conditions: (1) that the security interest was acquired by contract for the purpose of securing payment or performance of an obligation or indemnifying against loss; (2) that the property to which the security interest was to attach was in existence at the time the tax lien was filed; (3) that the security interest was, at the time of the tax lien filing, protected under state law against a judgment lien arising out of an unsecured obligation; and (4) that the holder of the security interest parted with money or money's worth." (citing 26 U.S.C. § 6323(h)(1))).

20.     The United States argues that EIP's interest does not qualify under the statute because EIP failed to meet the fourth prong, *i.e.*, that EIP did not part with money or money's worth.

21.     For this reason, I must analyze the fourth prong of the test to determine whether EIP parted with "money or money's worth."

**D.     "Money or money's worth"**

22.     As prescribed in 26 C.F.R. § 301.6323(h)-1(a)(3),[9] "money or money's worth" is defined as money or something "reducible to a money value."

23.     26 C.F.R. §301.6323(h)-1(a)(3) defines money or money's worth as including consideration "which was parted with before the security interest would otherwise exist if, under local law, past consideration is sufficient to support an agreement giving rise to a security interest. . ."

24.     Parting with "money or money's worth" has also been defined as:

> money, a security . . . , tangible or intangible property, services, and other consideration reducible to a money value.  Money or money's worth also includes any consideration . . . which was parted with before the security interest would otherwise exist if, under local law, past consideration is sufficient to support an agreement giving rise to a security interest. . . . [A]ny other consideration not reducible to a money value [is not] consideration in money or money's worth.

*In re Garcia*, 2002 WL 31409580 (S.D. Fla. Sept. 6, 2002) (quoting *United States v. 3809 Grain Ltd. P'ship*, 884 F.2d 138, 142 (4th Cir. 1989)).

25.     Thus, "money or money's worth" includes past consideration, if past consideration may support a security interest under local law.

26.     Under Florida law, the local law in this case, past consideration is sufficient to support the creation of a security interest.  Fla. Stat. § 673.3031(1)(c)

---

[9] Treasury regulations have the effect of law. *See Cottage Sav. Ass'n v. Comm'r,* 499 U.S. 554, 559 (1991) ("Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received Congressional approval and have the effect of law.") (citations omitted).

(providing that an instrument is issued for value if "issued or transferred as payment of, or a security for, an antecedent claim against any person, whether or not the claim is due"); *see also Deakter v. Menendez*, 830 So. 2d 124, 128-29 (Fla. 3d DCA 2002) (past consideration is valid to support a promissory note); *Goldberger v. Regency Highland Condominium Ass'n., Inc.,* 452 So. 2d 583, 585 (Fla. 4th DCA 1984) (execution of a note in satisfaction of an antecedent debt is satisfactory consideration for the note); *Lea v. Suhl*, 417 So. 2d 1179, 1181 (Fla. 2d DCA 1982) (issuance of a note in payment of an antecedent obligation rendered additional consideration unnecessary).

27.    Cancellation or renunciation of a promissory note and release of security is ineffective if it is unintentional or procured by mistake.  *All Real Estate Title Servs. v. Minqh Quang Vuu*, 2010 Fla. App. LEXIS 17636 (Fla. DCA 2d Nov. 17, 2010) (citing *Gover v. Home & City Sav. Bank*, 574 So. 2d 306 (Fla. 1st DCA 1991) and Fla. Stat. § 673.6041).

28.    The Eleventh Circuit explained in its earlier opinion regarding the other property involving K. Lenz that:

> . . . for Equity's interest in the property to have priority, Equity must show it is the holder of a security interest as defined by the Internal Revenue Code and Treasury Regulations.  But, because the Regulations direct us to apply state law to determine whether past consideration may satisfy the "money or money's worth" requirement, Florida law controls this issue. Past consideration may support the creation of a security interest under Florida law.  So, Equity may prove it parted with money or money's worth by showing that at the time the mortgage and mortgage modification were executed, both [K. Lenz] and Equity agreed that the purpose of the agreements was to secure repayment of the loans.
>
> *Equity Inv. Partners, LP v. Lenz*, 594 F.3d 1338, 1344 (11th Cir. 2010).

29.    To establish that past consideration supports a security interest, the holder of the security interest must prove that the purpose of the security interest was to secure repayment of the past consideration.  *Id.*

30.    The holder of the purported security interest has the burden of proof on this issue.  *Id.* at 1345.

31.    EIP has met its burden of proving that the mortgage on the Property was incurred to secure the past payments at issue in this case.

32.    Specifically, the testimony of both Daley and R. Lenz at trial established that the mortgage was recorded in order for EIP to perfect its security interest to ensure repayment from R. Lenz for the significant sums loaned to him by his children via EIP.

33.    Regarding the timing of the mortgage, testimony at trial was clear that in October 2004, R. Lenz was in the midst of preparing for his forthcoming prison sentence and settling the separate case with the FDIC.

34.    At the same time, EIP was in a position to protect its security interest and sought to do so by providing the mortgage in exchange for the prior loans and additional funds that continued to be loaned in the following years.

35.    Daley also cited the expensive costs of recording documents in the State of Florida as an additional basis for not perfecting the security interest any earlier than October 2004.

36.    There was no evidence that EIP or R. Lenz's actions in securing the mortgage were somehow unintentional or procured by mistake.

37.    Simply put, the trial testimony demonstrated that R. Lenz's impending prison sentence, and the necessity of ensuring that all matters were taken care of prior

38.   With respect to the amount of the mortgage, Daley explained that the value of the condominium—together with improvements made over time—resulted in the $300,000 figure.

39.   Further, Daley testified that a mortgage in excess of the property value was simply not feasible even though EIP had loaned in excess of $2 million to the Lenzes by October 2004.

40.   Accordingly, EIP provided consideration of at least $300,000 in cash to pay bills in exchange for the $300,000 mortgage.

41.   Despite the IRS' argument to the contrary, there is nothing significant of record that the IRS can point to in order to support its position that either the timing or amount of the mortgage was somehow improper.

42.   Indeed, IRS Officer Byrd testified that there was nothing in his investigation which demonstrated that the children had not forwarded funds via EIP to the Lenzes for various living expenses.

43.   Similarly, Officer Byrd testified under oath that he was not able to determine that the children were aware of the Lenzes' tax situation with the IRS.

44.   According, I find that there was substantial consideration for the mortgage as required under Florida law.

45.   Pursuant to federal law, since EIP has established that state law consideration exists, the "money or money's worth" requirement has been met and therefore, a security interest has been established.

**E.     Merger**

46.     The issue of whether a lien merges into the title is a matter of state law.

*See Tompkins v. United States*, 946 F. 2d 817, 819 (11th Cir. 1991).  The Eleventh

Circuit in *Tompkins* noted:

> State law usually dictates that senior lienors become fee owners when they purchase at a foreclosure sale conducted on their own lien.  In states that adhere to the merger doctrine, the lesser estate (or lien) 'merges' into the greater estate and is thereby extinguished.  Because the merger doctrine varies in its application from state to state, the former senior lienor's property interest depends upon how applicable state law treats merger.
>
> *Id.*

47.     Under Florida law, the intention of the party who unites the two estates

determines whether the legal and equitable titles merge.  *Gourley v. Wollam*, 348 So. 2d

1218 (Fla. 4th DCA 1977).  In *Gourley*, the Florida Supreme Court held:

> When a mortgage on lands and the equity of redemption in the same lands have become united in the same person, ordinarily the mortgage is merged, — in other words, ceases to be an incumbrance, — and the owner will hold the lands with an unincumbered title, if there be no other mortgage or lien.   But this is not always and necessarily the result. Whether it is or not, depends upon the intention of the person in whom the interests are united, and that intention is to be determined by his declarations at the time, or, in the absence of these, by his interest, as shown in the condition of things then existing, or by the attending circumstances.  <u>When there is no evidence of the intention of the owner in uniting the legal and equitable estates in himself, it is proper to presume that he intended that effect which is the most beneficial to him.</u>
>
> *Id.* at 1220 (emphasis added) (quoting *Jackson v. Relf*, 8 So. 184 (1890)).

48.     "There can be no merger at law, without a union of titles in the same

person; nor, in equity unless, also, there is an express or presumed intention on the part

of those concerned in the transaction that it should operate as a merger."  *Sanderson v.*

49.     The transfer of the Property to EIP in lieu of foreclosure did not extinguish EIP's interest in the Property.

50.     There was no evidence presented of any intention to merge the legal and equitable titles in the Property.

51.     Indeed, the evidence and testimony presented at trial supports the conclusion that EIP, through the children, and R. Lenz sought to secure the past payments through the newly executed mortgage.

52.     The purpose of executing the deed in lieu of foreclosure was to avoid having to sue R. Lenz and facilitating the sale of the condominium, an action which the children eventually had to take with respect to the 30 Compass Point property and K. Lenz.

53.     By entering into the mortgage agreement, EIP's position was secure such that a subsequent mortgage was not necessary each time EIP loaned money to the Lenzes.

54.     Accordingly, I find that EIP's mortgage constitutes a security interest in the Property and R. Lenz and EIP did not intend to extinguish EIP's mortgage when the deed to the Property was transferred to EIP's general parties.

**F.     Fraudulent transfer**

55.     Transfers to insiders for past consideration may be deemed fraudulent as to present creditors under Florida Statutes Section 726.106(2), which states:

> A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider

for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe the debtor was insolvent.

56.     A debtor's transfer or incurred obligation is fraudulent as to a creditor if the debtor acted:

(a)     With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(b)     Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

1.     Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

2.     Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Fla. Stat. § 726.105(1).

57.     Florida Statutes Section 726.105(2) provides a list of factors to determine whether "actual intent" to hinder, delay or defraud a creditor exists pursuant to Florida Statutes Section 726.105(1)(a).

58.     The first consideration listed is whether "[t]he transfer or obligation was to an insider."  Fla. Stat. § 726.105(2)(a).

59.     Florida Statutes Section 726.102(7) defines an insider for purposes of fraudulent transfers under Florida law.

60.     Pursuant to Section 726.102(7), the definition of an "insider" if the debtor is an individual includes:

1.     A relative of the debtor or of a general partner of the debtor;
2.     A partnership in which the debtor is a general partner;
3.     A general partner in a partnership described in subparagraph 2; or

4.     A corporation of which the debtor is a director, officer, or person in control.

61.     "The credibility of a witness is in the province of the factfinder[.]"  *United States v. Copeland*, 20 F.3d 412, 413 (11th Cir. 1994) (citing *United States v. Billue*, 994 F.2d 1562, 1563 (11th Cir. 1993)).

62.     In reversing and remanding the case involving the 30 Compass Point property and case against K. Lenz before Judge Altonaga, the Eleventh Circuit noted:

> These statements [regarding whether the mortgage and mortgage modification were executed to secure repayment of the debts owed to Equity by Randolph and Karin] could suffice to establish the purpose of the mortgage and mortgage modification. . . .  If believed, they would support a finding that the mortgages were given to satisfy the antecedent debts.  This finding would lead the court to hold that the mortgages were supported by past consideration and that Equity parted with "money or money's worth."  The truth of these statements, however, is disputed.  At trial, Equity will have the burden of proof on this element of its claim.

> *Lenz*, 592 F.3d at 1345.

63.     "Without determining the credibility of these statements, there remains a genuine issue of material fact that precludes summary judgment for either party— whether the mortgage and mortgage modification were executed to secure repayment of the loans."  *Id.* at 1345 (citing *United States v. Four Parcels of Real Property in Greene & Tuscaloosa Counties in State of Ala.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) for proposition that "it is not appropriate to assess credibility on summary judgment").

64.     Having the benefit of seeing the individuals testify before the undersigned during trial, I find that there is no evidence to contradict the statements made by Daley and R. Lenz during their live trial testimony.  *See McCormick v. City of Fort Lauderdale*,

65.     For example, it is undisputed that R. Lenz used the funds from the transfer to pay other creditors, his attorneys, the mortgage on the other property, and assessments for the condominium.

66.     It was similarly established that the funds paid to R. Lenz from EIP exceeded the amount of the mortgage by a substantial amount.

67.     Although the IRS argues that EIP's arguments were rejected in litigation regarding the 30 Compass Point property, *see supra* § I.A.ii, the instant case is a separate matter for which I must make certain and distinct credibility determinations.

68.     The United States argues that the mortgage was executed in anticipation of the IRS assessments against the Lenzes in an attempt to shield the Property from collection by the IRS.

69.     As the trial testimony established, and as undisputed by the parties, R. Lenz and the other two individuals who originally formed EIP withdrew on February 29, 2000 and R. Lenz subsequently brought in the children as principals of EIP.

70.     Following R. Lenz's withdrawal as a member of EIP, he no longer had any responsibility for or oversight of EIP.

71.     After 2000, the children made all decisions on behalf of EIP, and R. Lenz held no role in the company's day-to-day operations.

72.     Though R. Lenz and the children shared a familial relationship and EIP was interrelated with various other companies administered by the children, the other

73.     In fact, the children suggested making the loan through EIP, and it was not R. Lenz who originally proposed this arrangement.

74.     Daley testified on various occasions that she believed R. Lenz, because he was her father, would eventually repay EIP for the loans advanced to the Lenzes.

75.     Though the IRS' claim is that the evidence does not demonstrate why the mortgage was in the amount of $300,000 and why the mortgage was entered into in October 2004, I find this position untenable.

76.     As discussed *supra*, EIP established through trial testimony that despite being owed millions more, the mortgage was in the amount of $300,000 because that represented the approximate value of the property and it was not possible to secure a mortgage in an amount that exceeded the property value.

77.     Further, the explanation provided for the October 2004 timing of the mortgage related to the fact that R. Lenz was preparing for his impending incarceration.

78.     There was no evidence that clearly disputed EIP's position that the children were merely providing for their parents during a difficult time period.

79.     Indeed, IRS Officer Byrd conceded that he could not point to anything in the IRS files to contradict EIP's position regarding the nature, purpose, or scope of the loans made to the Lenzes.

80.     Though the children managed the various interrelated companies, ultimately, the children transferred money to their parents and made arrangements for payment of various living expenses.

81.     In short, the record demonstrates that the purpose of this arrangement was for the children to loan money to their parents during a time when R. Lenz's assets were frozen and he suffered from serious financial problems.

82.     At the time the security documents were entered into in January 2002, there was no IRS issue of any kind, evidencing the children's steps to protect their interests in the monies loaned, which were not intended as gifts, schemes, or scams.

83.     Viewing the totality of the circumstances, I cannot determine that EIP and/or R. Lenz engaged in a scheme carried on intended to defraud the IRS of its lien.

84.     The IRS has not met its burden to prove that R. Lenz possessed an actual intent to hinder, delay, or defraud creditors.

85.     Officer Byrd candidly acknowledged that nothing in his file or review thereof suggested that the children knew of their parents' tax problems.

86.     Daley also testified that she was unaware of these problems at the time that the mortgage was entered into during October 2004—even despite the interrelatedness of the various companies.  *See* Tr. at 25:10-26:18.

87.     Indeed, the evidence points to the suggestion and circumstances that the children were attempting to assist their parents to protect the equity.

88.     Taking into consideration all of the evidence, and for similar reasons based on credibility determinations as described *supra*, I determine that there was no fraudulent transfer or conveyance between EIP and R. Lenz and that R. Lenz was not an insider as defined in Florida Statutes Section 726.102(7).

89.     Accordingly, there is no basis for setting aside R. Lenz's incurring of the mortgage as a fraudulent transfer pursuant to Florida Statutes Section 726.105.

### III.   <u>CONCLUSION</u>

Having reviewed the testimony of the witnesses, exhibits admitted in evidence, the parties' written submissions, applicable law, and record, it is hereby

ORDERED AND ADJUDGED that:

1.   Final judgment will be entered by separate order in favor of EIP and against the IRS.   EIP shall file a proposed order of final judgment—including specific guidelines regarding the principal amounts held in the escrow account, in addition to any accumulated interest, as well as the institution(s) and account(s) from which funds shall be disbursed to and from, and detailed directives regarding foreclosure—**no later than Friday, July 29, 2011 at 5:00 p.m.**

2.   This case is ADMINISTRATIVELY CLOSED.

3.   Though this case is ADMINISTRATIVELY CLOSED, this shall not serve as a final close-out for purposes of appeal until final judgment is entered following EIP's filing of the proposed order.

DONE AND ORDERED in Chambers at Miami, Florida, this 12th day of July, 2011.

THE HONORABLE ALAN S. GOLD
UNITED STATES DISTRICT JUDGE

cc:   U.S. Magistrate Judge Jonathan Goodman
Counsel of record